**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **JOHN DAVIS,** | § | |
| | § | |
| *Plaintiff,* | § | **CIVIL ACTION NO. _____** |
| | § | |
| **v.** | § | |
| | § | |
| **INGA DOW, KELLER WILLIAMS** | § | **JURY TRIAL DEMANDED** |
| **REALTY, INC., GARY KELLER, and** | § | |
| **JOSH TEAM,** | § | |
| | § | |
| *Defendants.* | § | |

## ORIGINAL COMPLAINT

Plaintiff John Davis ("**Davis**") hereby sets forth his Original Complaint ("**Complaint**") against Defendants Inga Dow ("**Dow**"), Keller Williams Realty, Inc. ("**Keller Williams**"), Gary Keller ("**Keller**"), and Josh Team ("**Team**"):

## I.
## PARTIES

1.      John Davis is an individual residing in Eagle County, Colorado.

2.      Inga Dow is an individual residing and doing business in Tarrant County, Texas and may be served at 6904 Hazeltine Dr., Fort Worth, Texas 76132, or wherever she may be found.

3.      Keller Williams Realty, Inc. is a Texas for-profit corporation with a principal place of business located at: 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746.  Keller Williams may be served through its registered agent, Valerie Volger-Stipe, located at: 1221 South Mopac Expressway, Suite 400, Austin, Texas 78746, or wherever she may be found.

4.      Gary Keller is an individual residing and doing business in the State of Texas, and he may be served with process at 1812 Nora Drive, Pantego, Texas 76013; 700 Highlander Blvd., Arlington, Texas 76015; or wherever he may be found.

5.      Josh Team is an individual residing and doing business in Tarrant County, Texas and may be served at 3309 Alexandria Ct., Southlake, Texas 76092, or wherever he may be found.

## II.
## VENUE AND JURISDICTION

6.      This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship: Davis is a citizen of the State of Colorado, and Dow, Keller Williams, Keller and Team are citizens of the State of Texas, and the matter in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over Dow, Keller and Team because they reside in the State of Texas.

8.      This Court has personal jurisdiction over Keller Williams because it is incorporated and has its principal place of business in the State of Texas.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because it is the judicial district in which the Defendants reside, where Keller Williams conducts business, and in which a substantial part of the events giving rise to the claim occurred.

## III.
## INTRODUCTION

10.     Keller Williams is a real estate franchise company, founded, owned and largely managed by Gary Keller.  Davis is the former CEO of Keller Williams and former owner of several Keller Williams regions. Dow is a franchise owner. Team is the former President of Keller Williams.

11.     This case arises out of the perverted use of the judicial process by Dow, a Keller Williams franchise owner who mismanaged her businesses and then sought to sell them for more than their true value.  When she was unsuccessful, Dow then falsely accused Davis, a well-

respected and highly successful (now former) Keller Williams CEO, of rape and/or sexual assault in an effort to try and use the judicial process as a means to coerce the sale of her businesses on her terms, while at the same time muddying up Davis's reputation for personal gain.

12.     Dow's malicious and false allegations against Davis, which she divulged to Keller Williams, Keller and Team while Davis was negotiating the sale of his own businesses to Keller Williams and Keller Williams' related entities, were fraudulently omitted from and not disclosed to Davis by Keller Williams, Keller and Team, but instead, were used to gain business advantages and later, to disparage and harm Davis.

13.     To understand the gravity of Dow's malicious and perverted plan, it is important to understand the history of Dow's relationship with Davis and the mismanagement of Keller Williams after Davis resigned as CEO because of Keller's pressure to enact a strategy plan that was likely to significantly damage profitability for franchise owners and agents.  It was Keller's strategy plan which, in part, caused Dow's businesses to decrease in value and was the catalyst to Dow's filing of a federal complaint on false pretenses to seek a more favorable buyout.

14.     Davis was a young man in his 20's, when he met Dow in or around July 1996, before he became associated with Keller Williams.  In or around October 1996, Davis interviewed with Dow, who is almost ten years his elder and was very powerful and well connected at Keller Williams at the time, for a mortgage loan broker/officer position with Advantage Mortgage, a company owned by Keller.  Davis was offered and accepted the position.

15.     Approximately two years later, in the Spring of 1998, Dow initiated a voluntary, consensual, and non-exclusive sexual relationship with Davis that ultimately lasted until 2004. They mutually and amicably agreed to end their sexual relationship when Dow informed Davis

that she met someone (her current husband, Robert Dow).  Dow and Davis had minimal contact after 2004.

16.     Over the years, Davis became highly successful at Keller Williams and rose through the ranks until he was ultimately named President and Chief Executive Officer of Keller Williams in April of 2017.  In that role, Davis effectively engineered a strategy that furthered profitability for franchisees and agents.  Davis also owned several market centers and regions throughout the United States and Canada, which were very profitable.

17.     Keller, the founder of Keller Williams, did not appreciate the attention Davis received for his successful management strategy because it took the spotlight away from him, and at the end of 2017, introduced a new business strategy to universally and generally reduce market center caps[1], and wanted Davis to support it.  Davis resisted for years.  Davis tried to push back because this strategy not only hurt market centers (and ultimately agents), but it would have also hurt Davis personally.  Davis supported healthy, profitable ecosystems and did not want to hurt operators who had put their faith—and invested their futures—in Keller Williams and Davis's

---

[1] In most real estate franchise companies, agents pay a fee to be a part of the franchise and to work out of a particular office.  At Keller Williams, both of these fees are collected as a portion of the agent's commission and are capped annually. The amount that an agent pays to the office or "market center" is called the "market center cap."  The market center cap is initially set by the market center owner as part of the franchise agreement, which is approved by Keller Williams.  As this amount is collected, it is referred to as "company dollar." Company dollar is used by the market center to provide space, service, and support to agents.  The amount that is left over after a market center pays its bills becomes profit, a portion of which is shared back to agents.

In theory, lowering a cap creates a competitive advantage for the market center, which could lead to growth/expansion for that market center and for the company as a whole.  In reality, determining a market center cap requires a careful business analysis that incorporates the needs and expectations of agents in the market and in the market center, a consideration of current and future expenses as related to agent leadership, space, service, and support, and a realistic analysis of recruiting capabilities and attrition rates.  To simplify, if a market center owner decides to reduce their cap by half, they have just reduced their income by half.  They would need to then recruit double the number of productive agents to continue at the same level of profitability.  If they do not recruit the number of productive agents they need, at the pace they need, they may need to reduce the leadership, space, service, and/or support they provide to agents.  This may further impair their ability to recruit productive agents at the pace they need.  This equation is further complicated by the fact that if they are competing on cost, they are recruiting agents whose main concern is cost, not production.  These agents may not be interested in building businesses and thereby may only pay a portion of the cap (if any) per year.

teachings.  If Davis had gone along with Keller's strategy, or at the very least not resisted it, Davis believed it would have harmed independent operators and diminish their future. This was the antithesis of Davis's motivation, and it would have hurt him to do so.  Moreover, in recommending specific and universal market center cap amounts, Keller was overstepping the franchisee's role in leading an individually owned and operated market center.  This could have potentially led to litigation because of the impact to market centers.  Davis was unsuccessful in convincing Keller to reconsider his management strategy.   Because of this conflict in strategy, Davis had no other option than to resign from his CEO position in January 2019.

18.    Dow, owning several market centers in the Texas area, incorporated Keller's management strategy of reducing market center caps to Keller's prescribed level, causing her market centers, which were already not highly profitable because of Dow's lavish lifestyle and mismanagement, to suffer financially and further decrease in value.  Any profitability Dow's market centers may have had was not enough to withstand the slashing of her income.  Dow tried to sell her market centers shortly thereafter, but because of the decrease in cash flow, largely due to the reduction in market center caps, her businesses were not worth the price that she was asking.

19.    Dow, seeking to coerce a sale on her terms, raised feigned sexual assault claims against Davis.  In her original federal complaint, filed in the Northern District of Texas under Civil Action No. 4:21-cv-01209 on November 2, 2021 ("**the Federal Lawsuit**"), Dow, falsely alleged that Davis "raped" her and forced sex on her for years.  Dow, and her attorneys, raised these false allegations as a fear tactic to coerce Keller Williams to purchase her market centers for more than they are worth.  Dow, and her attorneys, believed the false allegations against Davis and several other Keller Williams operators would cause Keller to succumb to the pressure for fear of bad

publicity against his company and would lead to a more favorable sale for Dow, especially because at the time it was believed that Keller was taking Keller Williams public.

20.     Contrary to her pleadings in the Federal Lawsuit, Dow, in a conversation that was recorded in or around November 2020, before filing her federal court complaint, acknowledged the falsity of the allegations to Keller Williams's attorneys when asked directly whether Davis "raped" her.  Dow unequivocally responded "**NO**."  Notwithstanding this admission, Dow and her attorneys, less than one year later, filed a complaint alleging that Davis raped her.  Dow and her attorneys, only after receiving pressure from opposing counsel, amended the Complaint to water down the word "rape" to falsely allege sexual assault.  In either event, the harm to Davis has been accomplished, and Dow acknowledged that to a colleague when she stated, "it does not matter whether the allegations are true or not, it only matters that they are out there."

21.     Notably, Davis has had little interaction with Dow since 2004, and most if not all of the interaction since then were initiated by Dow and concern her high praise for Davis's accomplishments.

22.     In 2020, Davis negotiated a sale of his highly profitable regions to another Keller Williams operator for approx. $46,000,000, which was rejected by Keller Williams, through Keller and his right-hand man, Team.  Unbeknownst to Davis and his attorneys, Dow's false allegations were made to Keller Williams, Keller and Team while Davis was negotiating the sale of his regions and his separation from Keller Williams.  Keller Williams, Keller and Team intentionally concealed this information from Davis and used it to harm him by negotiating a deal with Davis, which disallowed Davis from defending himself against Dow's false and malicious claims—of which he did not know or have reason to know.

23.     After rejecting Davis's proposed sale of his regions to another Keller Williams operator, Keller Williams, Keller and Team left Davis no choice but to sell to Keller, and other insiders close to Keller, for tens of millions of dollars less than the previously negotiated sale, and well below their actual value.  Keller's and Team's rejection of the sale to the other Keller Williams executive was because of Dow's false, malicious and salacious allegations against Davis and sexual harassment claims against the other Keller Williams executive seeking to purchase the businesses.  Had Davis or his attorneys been advised of the false allegations when Keller Williams, Keller and Team learned of them, Davis and his attorneys would have negotiated his exit and the sale of his regions differently.

24.     Keller Williams, Keller, and Team used Dow's allegations, which they knew were malicious and false, as a sword against Davis and as a means to obtain a financial windfall through a forced and severely reduced sale of Davis's regions.

25.     Notably, Keller Williams, Keller, and Team, prior to the allegations by Dow, deliberately lengthened the amount of time it took to complete Davis's separation from Keller Williams.  It took Keller Williams, Keller, and Team nearly two years, from Jan 7, 2019, until Nov 4, 2020, to complete the contracts/agreements for Davis's separation. By comparison, other CEO agreements were completed in a matter of weeks and never more than 6 months.  Upon information and belief, Keller Williams, Keller, and Team stalled on completing Davis's paperwork because of the success and profitability Davis brought to Keller Williams and the fear that he could become employed by a competitor.  Upon information and belief, Keller Williams, Keller and Team sped up the process shortly after they learned of Dow's accusations in the summer of 2020 and did not advise Davis of Dow's allegation because they knew Dow's accusations, coupled with the restrictive terms of the Release and Restrictive Covenant Agreement between Davis and Keller

Williams dated November 4, 2020 (hereafter referred to as "**Separation Agreement**"), were likely to harm Davis's reputation and take Davis out of the equation as far as becoming employed by a competitor.

26.     Since Davis's resignation from Keller Williams, Keller and Team have done everything in their power to disparage Davis's reputation, including offering the illusion that Davis was fired because of Dow's salacious allegations, and demoting or terminating Keller Williams's employees and agents who praised Davis while promoting others who spoke ill of Davis.  These actions by Keller Williams, Keller and Team are in violation of the anti-disparagement clause in the Separation Agreement.

27.     Although Dow attempted to use the false and salacious allegations against Davis for her own gain, to force a sale of her market centers on her terms, her scheme did not work.  Dow then stepped up her plan to place pressure on Keller Williams and Keller to purchase her market centers on her terms by submitting a false and misleading complaint to the EEOC on December 28, 2020. Notably, the EEOC Complaint makes no mention of rape, sexual assault, or any occurrences before 2002, and is inconsistent in many other respects with the allegations in the Federal Lawsuit.  Keller Williams and Keller rightfully continued to refuse to succumb to her legal threats.

28.     The EEOC declined to pursue a lawsuit on Dow's claims and instead issued Dow a "Right to Sue."  After receiving her "Right to Sue" from the EEOC in August 2021, Dow authorized the filing of the vindictive, manipulative, and meritless lawsuit comprised of false allegations against Davis, as well as Keller Williams, Keller and other Keller Williams colleagues that chose not to purchase her market centers. The Federal Lawsuit is a malicious work of fiction

masquerading as a legal complaint, with the intention of coercing Keller Williams and Keller into a settlement to fund Dow's exit from Keller Williams.

29.     Dow's perverted use of the judicial process, from the submission of the EEOC complaint through the filing of the Federal Lawsuit, is an outrageous abuse of the judicial process designed to manipulate and coerce a sale of her market centers in a manner that she did not and could not accomplish before she filed her lawsuit.  The false and malicious allegations have ruined Davis's reputation in the industry and have/will cause Davis to lose career opportunities, amounting to losses of more than $300,000,000.  Moreover, Dow's salacious and false claims of harassment interfered with the sale of Davis's regions in 2020, causing a loss of multiple tens of millions of dollars.

30.     As a result of the harm caused by Dow's intentional and malicious actions, Davis seeks compensatory and punitive damages for Dow's tortious interference with contract and her abuse of the judicial process, resulting in severe damage to Davis's reputation, along with attorneys' fees for having to defend against Dow's baseless and malicious allegations.  Davis further seeks compensatory and punitive damages, and attorneys' fees from Keller Williams, Keller and Team for fraudulent omission, breach of good faith and fair dealing, civil conspiracy, breach of fiduciary duty, breach of contract and/or for tortious interference with contract.

## IV.
## FACTUAL ALLEGATIONS

### JOHN DAVIS BUILDS A REPUTATION OF INTEGRITY AND SUCCESS

31.     John Davis began his career in the residential real estate industry in 1996 at the age of twenty-eight (28) as a Loan Officer with Advantage Mortgage, which was owned by Keller, founder of Keller Williams.  Davis interviewed with Dow for the Loan Officer position.  From

there, Davis went on to become a broker within the Keller Williams system and a well-respected investor and operator of multiple Keller Williams market centers and regions.

32.     In 2011, Davis was named Vice-President of Keller Williams, and created and implemented Keller Williams's growth initiative, which was instrumental in Keller Williams becoming the leading residential brokerage firm in the world.  His career soon after "took off," and Davis was recognized as a leader and admired in the real estate industry, so much so that in January 2015, Davis was named President of Keller Williams by its founder, Keller, and in April 2017, Davis was named President and Chief Executive Officer of Keller Williams.

33.     While Davis's career was on an upward trajectory, he did not stray from his humble beginnings and his wish to help others rise in the industry and beyond.  In that vein, one of the programs Davis is proudest of accomplishing during his leadership is his Growth Initiative, which focused on creating a healthy, profitable real estate ecosystem that benefited all parties.  Davis's strategy protected market center businesses, while also empowering agent businesses with the greatest possible advantages for support, service, market share, and growth opportunities.  Davis did not want agents to be dependent on Keller Williams.  He wanted to teach them to grow their businesses.  This aligned with Keller's teaching that Keller Williams was an interdependent model, not dependent or independent.  Davis's strategy was highly successful in accomplishing just that.

34.     Under Davis's leadership, Keller Williams achieved the "Triple Crown" of the real estate industry, becoming #1 in US in Agent Count, Closed Units, and Closed Volume, a feat that had never been previously achieved by Keller Williams.

35.     Davis's success led to his being named to numerous third-party lists for top executives across all industries, such as being named #30 Top CEO by Glassdoor in 2018 with 95% approval rating, and established Keller Williams as a top workplace; and being named to

Forbes 2018 Best Employers List for Women and #1 on Indeed's 15 Top-Rated Workplaces: Best Culture.

36.     In 2018, Davis was ranked 7th most influential person in real estate in the Swanepoel Power 200 (the official and most recognized ranking system of leaders and executives in the real estate industry).

JOHN DAVIS'S RELATIONSHIP WITH INGA DOW

37.     Before the start of Davis's career, he met an older and experienced broker at Keller Williams, Dow, as she was then friends with his aunt who was also a Keller Williams broker.  A few months later, Dow interviewed Davis for a Loan Officer position with Advantage Mortgage. Dow was a worldly, highly successful, driven, and aggressive person known for "getting her way." She quickly established herself as Davis's mentor and took it upon herself to introduce Davis to others within Keller Williams, and help the inexperienced Davis build a foundation for his real estate career.  Dow invited Davis to various social and networking gatherings, including in or around the spring of 1998, when Dow invited Davis to participate in an investment club that met at her home.

38.     At this time, Dow was well-connected and powerful within Keller Williams, having achieved early success as an agent and then as a team leader for an office owned by Keller, with Keller being her direct supervisor.  After a meeting, Dow asked Davis to stay after the others left to help her clean up.  Davis agreed.  It became quickly apparent to Davis that Dow's invitation to clean the house was a cover to find time alone with Davis and make sexual advances toward him. Davis was surprised since up until this point Dow had served merely as a professional mentor, but Davis was open to the advances.  This marked the beginning of Dow and Davis's voluntary,

consensual, and non-exclusive sexual relationship that ultimately lasted approximately six (6) years.

39.     While Dow made bold advances towards Davis, Davis quickly understood that he was not Dow's only sexual pursuit.  Dow regaled Davis with tales of how she enjoyed mixing business with pleasure, using sexual tactics such as phone sex in her business pursuits and bragged to Davis about how she had sexual relations with other men within Keller Williams and that she could have him again or any other man if she wanted.  This behavior was witnessed by Davis as being specific to Dow, and not representative of the culture of Keller Williams or others achieving success within Keller Williams.

40.     Davis began to understand that Dow routinely used her own sexuality as a potent weapon to advance her career and control others.  Unfortunately, Davis, who was very young at the time, had no idea just how far Dow would go in using her personal sexual relationships to gain power and business advantage within Keller Williams.

41.     In or around August 1998, Dow made shocking false claims to Davis's aunt, who was a close friend of Dow at the time, stating that Davis was inappropriate during their consensual sexual encounters.  Davis's aunt met with Davis to discuss Dow's claims and Davis was outraged and horrified at the blatant falsehoods that Dow told his aunt.  He denied that anything inappropriate or uninvited had occurred in his time with Dow and insisted the claims were wholly false.  Davis was devastated that Dow would make such scandalous allegations to anyone, much less his aunt.  The occurrence temporarily ended the relationship between Davis and Dow, and all but ended the relationship between Davis and his aunt.  Both of these relationships would be reinitiated but would never be the same.

42.     A few months later, Dow reached out to Davis and begged for him to let her back into his life.  After Davis refused due to the irreparable rift Dow created in his family, Dow vowed to Davis that she would make it right.  Subsequently, Davis's aunt received a letter from Dow *admitting that her claims against Davis were fabricated* at the behest of Dow's abusive boyfriend at the time, who was reported by Dow to be jealous of Davis.  Dow also sent Davis a copy of this letter.  Davis ultimately allowed both Dow and his aunt back in his life, but the damage caused by Dow was never fully able to be repaired.

43.     Shortly after admitting to the blatantly false allegations and apologizing to Davis for same, Dow recruited Davis from Austin to the Dallas/Fort Worth area to enter into business together and so that Davis would be closer to her.  Notably, in the approximate ten (10) years that Dow had spent in business before recruiting Davis, Dow had accumulated considerably more power, connections, and financial resources than Davis.  There would have been zero repercussions against Dow for not engaging Davis.

44.     After Davis accepted Dow's offer and moved to Dallas/Fort Worth, Dow introduced Davis to high level management at Keller Williams, including the CEO.  It was in the Dallas/Fort Worth area that Davis started gaining recognition for his business acumen and motivational skills.

45.     Dow and Davis's consensual, non-exclusive relationship continued until approximately 2004, when Dow informed Davis that she had met someone, and Davis and Dow mutually and amicably agreed to discontinue their six-year sexual relationship.  After this conversation, Dow and Davis continued to engage sporadically as professional colleagues.  Dow on multiple occasions expressed her admiration and appreciation for Davis as he went on to

become a leader within Keller Williams, sending texts to Davis as recently as 2018 to congratulate him on his successes.

46.     Dow's allegations in the Federal Lawsuit would have one believe that Dow's sexual encounters with Davis were involuntary, non-consensual, isolated or few and far between.  This could not be further from the truth.  In their six-year relationship, spanning from 1998 to 2004, Dow had a voracious sexual appetite and engaged Davis in over 1000 voluntary sexual encounters, most of them initiated by Dow.  Notably, their relationship was not strictly sexual.  Dow would invite Davis over to her house and cook him dinner at times.  They took dance lessons together. Davis helped Dow when she suffered from a severe medical condition and needed assistance with activities of daily living.  Davis was also by Dow's side to help her recover from cosmetic surgery. It is therefore outrageous that Dow is now, over two decades later, accusing Davis of rape and/or sexual assault in a federal pleading as part of a calculated and malicious scheme to negotiate a favorable sale of her failing market centers.

JOHN DAVIS RESIGNS FROM KELLER WILLIAMS

47.     Despite Davis's success, it became clear that Keller's vision for the future of real estate did not align with Davis's vision.  What was not clear at that time, was how decisions being made by Keller and other members of the Keller Williams executive team would set a series of events in action culminating in the filing of a Federal Lawsuit by Dow and her attorneys against Davis, Keller, Keller Williams, and others, comprised wholly of false and defamatory allegations designed to use as leverage for the sale of her market centers.

48.     As Davis prosecutes this lawsuit against Dow for abuse of process, Davis anticipates that the process will compel him to fully recount the substantial internal Keller Williams strategic, political, and ethical disputes that Davis believes contributed to Dow's

financial struggles that motivated her to file a false EEOC complaint and Federal Lawsuit against Davis and others to coerce a better deal for the sale of her business.  Specifically, Keller's fears concerning Keller Williams's competitors adopting a lower overhead business model (designed to recruit agents away from Keller Williams with greater financial rewards) led to market center operators, including Dow, agreeing to follow Keller's recommendations to lower market center caps, a doomed strategy that Davis vehemently opposed.

49.     Notably, Davis was not necessarily against lowering market caps but was not supportive of lowering the caps to a prescribed level as a reactive, cost-based recruiting strategy without a proper analysis of each individual market center to determine whether the lowered market caps would negatively affect profitability for those agents and operators.  Davis was also not supportive of Keller's proposal because Keller had no plan to reduce the royalty cap received by Keller Williams from agents, leaving the individual franchise owners to absorb the full impact from the lowered caps.

50.     Davis tried everything in his power to stop Keller from incorporating his management strategy of universally and generically reducing market center caps, to no avail.  Since Davis was not supportive of doing anything that he perceived as hurting the long-term success and viability of the market centers and potentially violating franchise agreements with the market centers, it was clear that his time as an executive leader for Keller Williams had come to an end. Davis resigned rather than promote a set cap amount.

51.     In January 2019, Davis stepped down from his role as President and CEO and moved forward with a total exit from Keller Williams, which was effectuated on November 4, 2020.  Notably, Davis, having resigned over the disagreements with Keller over market caps, was the first and only CEO under Keller to have resigned from Keller Williams and pursue a complete

separation from Keller Williams.  His resignation and intention to completely separate from Keller Williams sent a flare to market center operators.

52.     Keller did not take Davis's resignation lightly, which became even more evident as Keller, and his right-hand man, Team, interjected themselves into the transactions necessary for Davis to separate from Keller Williams, including the sale of Davis's regions and the delay of his separation from Keller Williams, and sought to make the process as painful as possible for Davis, and as personally beneficial as possible for Keller.

53.     Team, having a storied career in "innovation," was recruited to Keller Williams because of Keller's vision that Keller Williams had to become a technology company.  Despite Team being inexperienced in leadership, real estate, and business in general, Keller insisted during Davis's tenure as CEO, that Team be made President of Keller Williams.  Davis pushed back because of Team's inexperience in leadership, which Team took personally.  Keller used Team's dislike for Davis to further his desire to destroy Davis's future and prevent him from becoming competition.

54.     Since Davis's "departure" from Keller Williams, Keller and Team have continually engaged in a smear campaign against Davis, including painting the illusion within the company that Davis was fired because of Dow's salacious allegations.  After Davis's resignation as CEO and continuing after the separation agreement was fully executed, Keller and Team did all they could to dig up dirt on Davis.  Team began interviewing individuals to carry out Keller's goal of making sure Davis's good name was smeared.  Any interviewee who held Davis in a positive light or was deemed to be on "Davis's team" was demoted or terminated, and those that spoke ill of Davis were promoted.  Keller and Team feared Davis would re-enter the real estate marketplace as a very formidable competitor and made it their continual goal to trash him.  These actions by

Keller and Team violated the anti-disparagement clause in the Separation Agreement with Keller Williams and Keller Williams's related entities.

DOW GREATLY DISHONORS THE FEDERAL JUDICIAL SYSTEM BY FALSELY AND MALICIOUSLY BRANDING JOHN DAVIS A CRIMINAL IN A DISGRACEFUL ATTEMPT TO EXTORT KELLER WILLIAMS INTO A BUSINESS DEAL

55.     After moving into executive positions at Keller Williams, Davis had very limited interaction with Dow, receiving a few text messages from Dow remarking on his achievements and thanking him for his leadership, and occasionally interacting at Keller Williams events.  Davis believes his last in-person interaction with Dow occurred in November 2015, at a MAPS Recharge event in Boston.  The last communication known to Davis occurred via text in 2018.

56.     Davis's roles at Keller Williams did not involve direct oversight of market center operations, including Dow and her market centers.  However, Davis has since become aware that Dow's market centers faced many challenges in recent years.  After apparently reducing market center company dollar caps in her market centers at Keller's request, the financial challenges for Dow appear to have escalated to the point that Dow no longer desired to be a Keller Williams market center owner.  Dow undertook efforts to sell her market centers but was apparently unable to garner offers sufficient to meet her financial needs and demands.  It is at this point that her desperation caused her to cross a clear moral and legal line to extort Davis, Keller Williams, Keller, and others associated with Keller Williams that Dow holds animus towards.

57.     Unbeknownst to Davis at the time, Dow made allegations to Keller Williams in or around the summer of 2020, in the form of a false and malicious story, with Davis as the lead villain and Dow as the powerless victim.  Although Davis's separation from Keller Williams had not been finalized as of the time Dow allegedly made her first legal demands to Keller Williams,

the allegations were not disclosed to Davis.  Davis's first notice of Dow's scheme was in November 2021, when Davis was served with a copy of Dow's complaint in the Federal Lawsuit.

58.    When Dow's fictional report to Keller Williams apparently failed to generate the reaction she desired, she submitted a false and misleading complaint to the EEOC on December 28, 2020.  As Keller Williams refused to succumb to her legal threats, after receiving her Right to Sue Letter from the EEOC on August 4, 2021, Dow authorized the filing of a vindictive, abusive, manipulative and meritless lawsuit comprised of false allegations against Davis, and Keller Williams, Keller and other Keller Williams colleagues that chose not to purchase her market centers.

59.    The Federal Lawsuit is a work of fiction masquerading as a legal complaint.  It's shocking, vulgar, false, and defamatory, and intentionally designed to (1) coerce the defendants in the underlying action into a settlement to fund Dow's exit from Keller Williams, and (2) destroy the reputations and careers of Davis and those that she envies and despises because they have excelled beyond the level Dow attained in her own career.

60.    The Federal Lawsuit accuses Davis of the heinous crime of rape that Dow knows will forever taint Davis's reputation, career, and personal wellbeing.  The "crime" is alleged to have occurred in 1998.  Incredibly, before the Federal Lawsuit was even commenced, Dow unequivocally denied to Keller Williams attorneys, in a recorded phone conversation, that Davis ever raped her, clearly showing her malintent and perverted use of the judicial process when she subsequent filed the blatantly untruthful Federal Lawsuit.  Further, her EEOC complaint included no such claims.

61.    Obviously, Dow's claims of rape or sexual assault in 1998 cannot be relevant to any claim being brought in 2021, as even if true, **which it is not**, the statute of limitations has long

expired.  Notably, the EEOC Complaint makes no mention of any occurrences before 2002 and is inconsistent in many respects with the allegations in the Federal Lawsuit.

62.     The false statements in Dow's 46-page Original Complaint and 57-page First Amended Complaint are too many to recount here, but easy to summarize:  Davis did not do any of the wrongful actions Dow and her attorneys allege in the Federal Lawsuit.  After feeling pressure from motions to dismiss and strike pleadings filed by each of the defendants in the Federal Lawsuit, including b Davis, which demanded removal of the false allegations, Dow amended her pleading against Davis and half-heartedly attempted to mitigate her egregious conduct in falsely accusing Davis of a crime in a public pleading by altering the language used.  However, the language in the Amended Complaint is still an outright lie and fails to mitigate the wrongdoing caused by the false and malicious accusations in the Original Complaint.  Moreover, Dow's false accusations were publicly reported in various media outlets.

63.     In taking this risky gamble, Dow and her attorneys on her behalf and with her consent and ratification, publicized salaciously false statements of fact about Davis in an attempt to achieve personal and financial gain and notoriety that was not obtainable, legally and logically, through the causes of action alleged in Dow's complaint.  Dow's conduct, which is complained of herein, is not protected by doctrines, privileges or immunities designed to promote unfettered and good-faith use of our legal process, because she acted in bad faith and with malice.  Because she used the privilege as a sword, she cannot also hide behind it as a shield.

64.     The act of filing the deceptive lawsuit is believed to be authorized by Dow as a means to an end.  However, Keller Williams, to date, has been unwilling to bend to Dow's will and pay her to dismiss the suit.

65.     Davis intends to vigorously prosecute this case and will do whatever it takes until the truth is exposed and Dow, and any and all others who acted wrongfully, are held fully accountable for their wrongful and malicious actions.

JOHN DAVIS IS IRREPARABLY HARMED

66.     As set forth above, Davis resigned from Keller Williams in January 2019 and finalized his full separation from Keller Williams in November 2020.  Davis had every intent of reentering the executive workforce after November 4, 2022, but because of the false and malicious claims by Dow, which Keller Williams and Keller knew of before finalizing the Separation Agreement but fraudulently omitted from Davis despite having a duty to disclose, his chances of reentering the workforce with similar compensation packages has sorely diminished.  Davis has sat by watching others of similar or lesser experience and reputation accept compensation packages worth over $50,000,000 and is in fear that the reputational harm caused by Dow's malicious and false allegations, and Keller Williams's, Keller's and Team's fraudulent omissions and smear campaign, have severely decreased his opportunity to receive similar offers.

67.     When Dow filed her Federal Lawsuit in November 2021, filled with salacious lies, and designed to attract attention and coerce the defendants into settlement to resolve her personal financial issues, Davis's good name and reputation, which took many years to create, was instantly obliterated and Davis was rendered completely radioactive as a future executive by the false and malicious lies of Dow.

68.     Keller Williams, Keller, and Team furthered Dow's malicious scheme when they engaged in a continual smear campaign to muddy Davis's reputation in the real estate industry, including falsely insinuating to agents and others that Davis was fired for sexual harassment or misconduct, and silencing anyone associated with Keller Williams who held Davis in high regard.

69.      Dow, Keller Williams, Keller, and Team knowingly and intentionally destroyed the future that Davis had worked his entire life to build.  Dow, Keller Williams, Keller, and Team have left Davis not only without a future in the executive role for which he has earned, but without any future opportunities.  Davis seeks damages of at least $300,000,000 from Dow, Keller Williams, Keller, and Team to compensate for the losses directly caused by their wrongful conduct.

70.      Moreover, Dow's false allegations played a central role in reducing the value that Davis received for his regional interests at the time of separation from Keller Williams.  Davis had negotiated a plan to sell his regional interests to Smokey Garrett, another unfortunate victim of Dow's false allegations, for an anticipated sale price of $46,000,000.  However, wielding Keller Williams's unchecked discretion, Keller and Team refused to allow Davis to sell his regional interests to Garrett as proposed.  As a result of Keller and Team's interference, the market value of Davis's interests was significantly depressed resulting in losses of tens of millions of dollars.

71.      Notably, Davis's regional interests included partial ownership interests as a limited partner in several limited partnerships (including The Republic of Colorado, Ltd., KW Mid-American Region, Ltd., Region Investco, Ltd., and Anacacho BE, Ltd.), over which Keller exercised control and acted as general partner.  In his capacity as general partner, Keller, having a fiduciary duty to the limited partners, including Davis, and having knowledge of Dow's allegations against Davis and the effect that such allegations would have on Davis's partnership interests, should have but failed to disclose the salacious allegations to Davis.  Instead, Keller used Dow's allegations in a manner that benefitted him personally and as general partner, and caused injury to Davis as a limited partner, when Keller did not permit Davis to sell his interests in the limited partnerships to Smokey Garrett for fair market value, and instead, *directed* that Davis's regional

interests in the limited partnerships be sold to himself (Keller), as well as other Keller Williams insiders, for much less than fair market value.

72.     The sale of Davis's regions could not be completed with Mr. Garrett as proposed because of the false allegations made by Dow to Keller and other Keller Williams executives, which were later published in Dow's EEOC charge, the Federal Lawsuit, and in media outlets. Notably, at no point during the negotiations of Davis's separation from Keller Williams did Keller, Team, or anyone else at Keller Williams inform Davis that Dow had made any allegations involving Davis or Garrett.  Had Davis been aware that these false and defamatory allegations existed, he would have materially changed his position and course of action with respect to his separation from Keller Williams, as the manner in which this contract was negotiated handcuffed Davis from defending himself against Dow's salacious claims.  The reduced value of Davis's interests is yet another way in which Dow's reckless, malicious, and false statements have significantly damaged Davis.

73.     Davis, having a motion to dismiss pending in the matter filed by Dow in the Northern District of Texas under Civil Action No. 4:21-cv-01209, was hopeful to get immediate and timely relief.  However, the Court recently ordered Dow and the Keller Williams parties to arbitrate their claims and closed the matter against Davis pending decision on the arbitration.  This decision puts Davis in a terrible position because it allows Dow's false and malicious claims against Davis to remain unresolved, possibly in perpetuity, and further harm his reputation and ability to earn a living commensurate with his previous position.  Moreover, the arbitration may lead to a resolution of the matter without Davis being a party, and the arbitration decision could potentially adversely affect Davis's ability to seek redress for the harms caused by Dow's false and malicious claims.  Davis, having been placed in an extremely precarious and unfair position,

has no choice but to bring this suit to not only seek redress for the wrongful conduct by Dow, Keller Williams, Keller, and Team, but also to restore his reputation and clear his good name.

## V.
## CAUSES OF ACTION & DAMAGES

### COUNT I
### Abuse of Process
### (Defendant Dow)

74.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

75.     Dow has made an illegal, improper, and perverted use of the litigation process by filing an administrative action (EEOC) and the Federal Lawsuit under false pretenses for the purpose of coercing a favorable sale of her businesses.

76.     Dow has an ulterior motive and malicious intent in using the process against Davis to better her position to sell her businesses.

77.     Dow has not instituted the Federal Lawsuit for the purpose of recovering on plausible claims against Davis.  To the contrary, the claims against Davis, if true, were time barred by more than two decades.  Dow is using the feigned intentional tort claims against Davis merely to coerce Keller and Keller Williams, through fear of negative exposure, to buy her market centers for more value than they are worth.

78.     Significant to an abuse of process claim is the use of process to accomplish an end which compels a party to do a collateral thing he would not otherwise be compelled to do.  *See Detenbeck v. Koester*, 886 S.W.2d 477, 480 (Tex. App.—Houston [1st Dist.] 1994, no writ).

79.     In the instant case, Dow cannot force a favorable purchase/sale of her market centers upon Keller or Keller Williams.  Dow is using this process to compel a forced purchase/sale as part of a global settlement of her allegations to the EEOC and in the Federal Lawsuit.  As the

Court in the underlying Federal Lawsuit filed by Dow has now ordered arbitration of Dow's claims against the Keller Williams entities and stayed the allegations against Davis despite a viable motion to dismiss pending, it is plausible that Dow will accomplish her goal to the detriment of Davis through her perverted use of the judicial process.

80.     Davis has suffered and will continue to suffer significant damages as a result of Dow's false, malicious, and obviously groundless claims.  Davis's reputation in the real estate industry has been trampled by Dow's false and malicious allegations, which are being exploited for Dow's personal gain.

81.     Dow has caused and/or contributed to Davis's more than $300 million in reputational damage, and loss of future employment/wages.

82.     The false allegations by Dow also caused Davis to lose tens of millions of dollars from the sale of his Keller Williams regions.

83.     The malicious attack on Davis by Dow has caused significant emotional distress and has been unrelentingly excruciating as Davis sees no end to the destruction of his honor, reputation, career, and livelihood in sight.  Davis has spent countless time and money defending false and malicious allegations in an action he should have never been a party to, and in negotiating the Separation Agreement and sale of his businesses that were adversely delayed and affected by Dow's salacious and false claims.  Davis therefore seeks punitive damages, in an amount to be determined at trial, for Dow's reprehensible conduct, which resulted in severe reputational and financial losses, and emotional damages to Davis.

## COUNT II
### Tortious Interference with Prospective Relations
### (Defendant Dow)

84.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

85.     The State of Texas recognizes a tort cause of action for interference with a prospective contractual or business relationship. *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001).  In raising a claim for interference with a prospective contractual or business relationship, a plaintiff must prove he was harmed by conduct that was either independently tortious or unlawful. *Id.*

86.     Upon information and belief, Dow was aware that Davis was negotiating a contract for the sale of his highly profitable regions to another Keller Williams operator (Mr. Garrett) when she knowingly and intentionally made false, defamatory, and malicious allegations against Davis and the prospective purchaser (Mr. Garrett), specifically including in the Federal Lawsuit, that caused Keller Williams and Keller to reject the proposed sale.  Dow's defamatory statements against Davis and the prospective purchaser (Mr. Garrett) constitute the element necessary to establish conduct that was independently tortious and/or unlawful.

87.     As a result of these false, defamatory, and malicious allegations against Davis and Mr. Garrett, Keller left Davis no choice but to sell his interests in Keller Williams and his limited partnership interests to Keller Williams, Keller, and other insiders close to Keller, for well below their value.

88.     Keller rejected the sale of Davis's regions to the other Keller Williams executive because of Dow's false, defamatory, and malicious allegations of sexual assault against Davis and

sexual harassment claims against another Keller Williams executive seeking to purchase the businesses.

89.     Keller Williams, Keller, and Team used Dow's false and malicious allegations to their advantage in rejecting the initial proposed sale and negotiating a more favorable sale of Davis's interests to Keller and insiders close to Keller.

90.     As a result of Dow's wrongful conduct and tortious interference with the prospective purchase, Davis has suffered significant damages, including a loss of tens of millions of dollars for the sale of Davis's regions.

91.     Davis further seeks punitive damages, in an amount to be determined at trial, for Dow's reprehensible conduct, which resulted in severe reputational and financial losses to Davis, and emotional damage.

**COUNT III**
**Fraud by Omission**
**(Defendants Keller Williams, Keller, and Team)**

92.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

93.     Keller Williams, Keller and Team learned of the salacious allegations by Dow against Davis while Davis was still employed by and/or associated with Keller Williams.  Dow made these false allegations against Davis in an effort to negotiate a favorable sale of her market centers.

94.     The allegations by Dow were made while Davis was in the course of negotiating his separation from Keller Williams and the sale of his regional interests to Keller Williams and Keller Williams' related entities, all owned, in whole or in part, by Keller.

95.     Keller Williams, Keller and Team had a fiduciary duty as Davis's employer, to disclose these material facts to Davis, but willfully chose to withhold such information, knowing that the disclosure of the malicious and false allegations would delay or terminate negotiations, and with the knowledge that the Separation Agreement as written provided an unfair advantage to Keller Williams, Keller and Team, as the confidentiality and non-compete clauses would make it nearly impossible for Davis to defend his reputation and compete against Keller Williams when the 2-year non-compete clause expires.

96.     Keller, as the controlling member and/or general partner of several limited partnerships, of which Davis was a limited partner, further owed Davis a fiduciary duty to disclose material facts to Davis which could affect Davis's ownership interests.  Keller breached his duty as general and controlling partner in the limited partnerships when he withheld such information from Davis to Davis's detriment.

97.     Keller Williams, Keller, and Team knew that the disclosure of the allegations by Dow would lead to Davis's rejection of the Separation Agreement.

98.     The fraudulent omissions which occurred well before the execution of the Separation Agreement misled Davis and his attorneys to believe that Davis's reputation and ability to compete in this industry after the non-compete clause expired would not be negatively affected. Keller Williams, Keller, and Team misled Davis into executing the Separation Agreement and the sale of his regional interests in a manner that prohibited him from defending or maintaining his reputation against the false malicious claim.

99.     Had Keller Williams, Keller and Team disclosed the material information, Davis would have certainly delayed his separation from Keller Williams to protect his reputation from being further harmed while he defended against Dow's cruel scheme.

100.     The fraudulent omissions by Keller Williams, Keller and Team were further used to harm Davis when Keller Williams, Keller and Team misrepresented the reason for the rejection of the sale of Davis's regions to another Keller Williams operator for approx. $46,000,000 and forced the sale of Davis's regions in a manner that unfairly enriched Keller Williams, Keller, and Team, at a loss of tens of millions of dollars to Davis.

101.     The fraudulent omissions have caused Davis to suffer tremendous damages to his career and reputation, from which he is unlikely to recover and will likely cause or contribute to losses of more than $300,000,000.

102.     Davis further seeks punitive damages, in an amount to be determined at trial, for Keller Williams's, Keller's and Team's reprehensible conduct, which resulted in severe reputational and financial losses to Davis and contributed to his emotional damage.

### COUNT IV
### Civil Conspiracy
### (Defendants Keller and Team)

103.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

104.     Keller and Team learned of Dow's allegations against Davis while Davis was still employed by and/or associated with Keller Williams.  Dow made these false allegations against Davis in an effort to negotiate a favorable sale of her market centers.

105.     The allegations by Dow were made while Davis was in the course of negotiating his Separation Agreement and the sale of Davis's own businesses to Keller Williams and Keller Williams's related entities, all owned, in whole or in part, by Keller.

106.     Keller had a fiduciary duty as Davis's employer, as the general partner of several limited partnerships wherein Davis was a limited partner, and/or based on Keller's long term

personal relationship with Davis, to disclose these material facts to Davis, but willfully conspired with Team to withhold such information, knowing that the disclosure of the malicious and false allegations would delay or terminate negotiations, and with the knowledge that the Separation Agreement as written provided an unfair advantage to Keller Williams, Keller and Team, as the confidentiality and non-compete clauses would make it nearly impossible for Davis to defend his reputation and compete against Keller Williams when the 2-year non-compete clause expires.

107.    Keller and Team knew that the disclosure of the allegations by Dow would lead to Davis's rejection of the Separation Agreement.

108.    The conspiracy to withhold information from Davis misled Davis and his attorneys to believe his reputation and ability to compete in this industry after the non-compete clause expired would not be negatively affected.  Keller and Team misled Davis into executing the Separation Agreement and the sale of his own businesses in a manner that prohibited him from defending or maintaining his reputation against the false malicious claim.

109.    Keller and Team conspired to harm Davis by rejecting the sale of Davis's regions to another Keller Williams operator for approx. $46,000,000 under a false pretense and forcing the sale of Davis's regions in a manner that benefitted Keller Williams, Keller, and Team, at a loss of tens of millions of dollars to Davis.

110.    Keller and Team further conspired to harm Davis by engaging in a smear campaign to ruin Davis's reputation and prevent Davis from entering the marketplace as a formidable competitor.

111.    The conspiracy by Keller and Team to withhold material information, to reject a sale of his regions for fair value and to smear Davis's good name caused Davis to suffer

tremendous damages to his career and reputation, from which he is unlikely to recover and will likely cause or contribute to losses of more than $300,000,000.

112.   Davis further seeks punitive damages, in an amount to be determined at trial, for Keller's and Team's reprehensible conduct, which resulted in severe reputational and financial losses to Davis and contributed to his emotional damage.

**COUNT V**
**Breach of Fiduciary Duty**
**(Defendant Keller)**

113.   Davis repeats and realleges each and every allegation above as though fully set forth herein.

114.   Keller served as the general and controlling partner of several limited partnerships, including The Republic of Colorado, Ltd., KW Mid-American Region, Ltd., Region Investco, Ltd., and Anacacho BE, Ltd., wherein Davis was a limited partner.

115.   In his capacity as general and controlling partner, Keller owed Davis a fiduciary duty to disclose material facts to Davis which could affect Davis's ownership interests.

116.   Keller breached his fiduciary duty to Davis when he withheld information concerning Dow's claims of sexual assault against Davis, and weaponized her salacious allegations by interfering with the sale of Davis's interests in the limited partnerships for Keller's own benefit.

117.   Keller breached his fiduciary duty to Davis by causing Davis to enter into a contract with knowledge that Davis would not be able to defend against Dow's allegations, and by engaging in a smear campaign to muddy Davis's good name.

118.   Keller further breached his fiduciary duty to Davis by engaging in a smear campaign to ruin Davis's reputation and prevent Davis from entering the marketplace as a formidable competitor.

119.     As a result of Keller's breach of fiduciary duty, Davis was caused to suffer irreparable injuries to his reputation, career, livelihood, and well-being, that caused or contributed to losses of over $300,000,000.

120.     Accordingly, Davis is seeking compensatory damages, punitive damages, and attorney's fees.

## COUNT VI
### Breach of Good Faith and Fair Dealing
### (Defendant Keller)

121.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

122.     Keller and Davis had a long-standing "special relationship" of approximately 20 years, wherein mutual confidences and significant trust were shared.

123.     Davis's relationship of confidence and trust with Keller existed well before he was employed by Keller Williams and is not simply based on an employer/employee or a general partner/limited partner relationship.

124.     The relationship between Keller and Davis existed for so long that Davis was justified in relying on Keller to act in his best interest.

125.     Keller breached his duty of good faith and fair dealing when he withheld information concerning Dow's claims of sexual assault and weaponized it by interfering with the sale of Davis's regions for Keller's own benefit.

126.     Keller breached his duty of good faith and fair dealing by causing Davis to enter into a contract with knowledge that Davis would not be able to defend against the allegations and maintain his good reputation.

127.     Keller further breached his duty of good faith and fair dealing by engaging in a smear campaign to ruin Davis's reputation and prevent Davis from entering the marketplace as a formidable competitor.

128.     As a result of Keller's breach of good faith and fair dealing, Davis was caused to suffer irreparable injuries to his reputation, career, livelihood, and well-being, that caused or contributed to losses of over $300,000,000.

129.     Accordingly, Davis is seeking compensatory damages, punitive damages and attorney's fees.

**COUNT VII**
**Breach of Contract**
**(Defendants Keller Williams and Keller)**

130.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

131.     On November 4, 2020, Davis entered into the Separation Agreement with Keller Williams and its related entities.

132.     Keller, as owner of Keller Williams and its related entities, while not a signatory, was a party to, and engaged in the negotiations of the Separation Agreement and Davis's regions.

133.     The Separation Agreement contains an anti-disparagement provision, prohibiting Keller Williams and its related entities from disparaging Davis or casting Davis in any false or negative light, or making disparaging, negative or false comments or statements concerning Davis, their experiences with Davis or the qualifications or performance of Davis.   The anti-disparagement provision further provides that Keller Williams and its related entities shall use commercially reasonable efforts to cause no representative of Keller Williams or its related entities from engaging in any of the foregoing.

134.     Not long after the execution of the Separation Agreement with Keller Williams, Keller, and Keller Williams's related entities on November 4, 2020, Keller, and Team, continued to engage in a smear campaign against Davis, including painting the illusion within the company that Davis was fired due to allegations of sexual misconduct.

135.     After Davis resigned as CEO in January 2019 and continuing after the Separation Agreement was signed on November 4, 2020, Keller and Team did all they could to dig up dirt on Davis.  Team interviewed individuals to carry out Keller's goal of making sure Davis's good name was smeared.  Any individual who held Davis in a positive light or was deemed to be on "Davis's team" was demoted or terminated, and those that spoke ill of Davis were promoted.

136.     Neither Keller Williams, nor its related entities, took any reasonable measures (commercially or otherwise) after Davis stepped down as CEO, and more importantly, after the Separation Agreement containing the anti-disparagement clause was signed, to stop the continual campaign by Keller and Team against Davis.

137.     The aforementioned actions by Keller Williams, Keller and Team violated the non-disparagement clause in the Separation Agreement with Keller Williams, Keller, and Keller Williams's related entities, entitling Davis to full indemnification for all damages caused by the breach, including the significant harm to Davis's reputation, career, and wellbeing, amounting to well over $300,000,000, and the recovery of attorney's fees.

**COUNT VIII**
**Tortious Interference with Contract**
**(Defendants Keller and Team)**

138.     Davis repeats and realleges each and every allegation above as though fully set forth herein.

139.     On November 4, 2020, Davis entered the Separation Agreement with Keller Williams and its related entities.

140.     The Separation Agreement contains an anti-disparagement provision, prohibiting Keller Williams and its related entities from disparaging or casting Davis in any false or negative light, or making disparaging, negative or false comments or statements concerning Davis, their experiences with Davis, or the qualifications or performance of Davis.  The anti-disparagement provision further provides that Keller Williams and its related entities shall use commercially reasonable efforts to cause no representative of Keller Williams or its related entities from engaging in any of the foregoing.

141.     Keller and Team willfully and intentionally interfered with the contract between Davis and Keller Williams, when they continually engaged in a smear campaign against Davis, including painting the false illusion within the company that Davis was fired due to Dow's allegations of sexual misconduct.

142.     After Davis left Keller Williams, Team, under Keller's direction and for his own benefit to retaliate against Davis, did all he could to dig up dirt on Davis.  Team began interviewing individuals to ensure Davis's good name was forever smeared so Davis would never become the competitor to Keller Williams they feared.  Any interviewee who held Davis in a positive light or was deemed to be on "Davis's team" was demoted or terminated, and those that spoke ill of Davis were promoted.

143.    The aforementioned actions by Keller and Team proximately caused or contributed to significant harm to Davis's reputation, career, and wellbeing, amounting to well over $300,000,000.

## PRAYER FOR RELIEF

For these reasons, John Davis prays that this case be set for trial and that upon a final hearing of the cause, judgment be entered for Davis for all damages, recoverable amounts, and other relief in favor of Davis.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated: October 27, 2022                    Respectfully submitted,

**ATTORNEYS FOR JOHN DAVIS**

**NESENOFF & MILTENBERG LLP**

By:   */s/ Andrew T. Miltenberg*
          Andrew T. Miltenberg (PHV pending)
          Janine L. Peress (PHV pending)
          363 Seventh Avenue, 5th Floor
          New York, NY 10001-3904
          Telephone:   (212) 736-4500
          Facsimile:   (212) 736-2260
          Email:   amiltenberg@nmllplaw.com
                         jperess@nmllplaw.com

              -and-

**CREWSE LAW FIRM, PLLC**

By:   */s/ James Crewse*
          James Crewse
          Texas Bar No. 24045722
          5546 Goodwin Ave.
          Dallas, TX 75206
          Telephone:  (214) 394-2856
          Email:   jcrewse@crewselawfirm.com